FILED

2024 Nov-15 PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **White Arnold & Dowd P.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:23-cv-01372-ACA** |
| **v.** | ) | |
| | ) | |
| **TomPaul ACIPCO, LLC and Paul Smith,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY TOMPAUL ACIPCO, LLC AND PAUL SMITH BY WHITE ARNOLD & DOWD, P.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **White Arnold & Dowd P.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:23-cv-01372-ACA** |
| **v.** | ) | |
| | ) | |
| **TomPaul ACIPCO, LLC and Paul Smith,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## Table of Contents

I.     STATEMENTS OF FACTS………..…………………………………….....5

    A.    WAD Response to TomPaul's Statements of Undisputed Facts………5

    B.    Additional Statement of Undisputed Facts in Opposition to TomPaul Motion for Summary Judgment……………………………..…….........12

        1.    The Retention Agreement……………………………………12

        2.    The Activity in the Underlying Action………………………..14

        3.    WAD's Efforts to Keep TomPaul Informed…………………..17

        4.    Mr. Jardini's Lack of Methodology and Impartial Review……20

II.    STANDARD FOR SUMMARY JUDGMENT……………………..………21

III.   THE ALLEGED BREACHES OF THE STANDARD OF CARE IN ALABAMA ARE NOT SUPPORTED BY TOMPAUL'S STATEMENT OF FACTS.………………………………………….……………………22

    A.    Block Billing Is Not a Violation of the Standard of Care in Alabama……………………………………………………………..24

B.    TomPaul fails to provide evidence that WAD improperly staffed the Underlying Litigation, particularly in light of the extent of work needed……………..…...............................................................26

C.    TomPaul Has Not Provided Evidence That WAD Breached a Standard of Care by Having Multiple Attorneys Attend Meetings and Major Events……………………………………………………………..27

D.    TomPaul Has Not Provided Undisputed Facts to Support its Claim that WAD's billing descriptions were vague……………………………..29

E.    TomPaul Has Not Provided Undisputed Facts to Support Its Claim that WAD Performed unnecessary Work………………………………...30

F.    TomPaul Is Not Entitled to Attorneys' Fees or Pre-Judgment Interest………………………………………………………….31

IV.    CONCLUSION……………………………………………………………32

CERTIFICATE OF SERVICE ……………………………..…………………..34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **White Arnold & Dowd P.C.,** | ) |
| | ) |
|     **Plaintiff,** | )   **Case No. 2:23-cv-01372-ACA** |
| | ) |
| **v.** | ) |
| | ) |
| **TomPaul ACIPCO, LLC and Paul Smith,** | ) |
| | ) |
| | ) |
|     **Defendants.** | ) |

## OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiff/Counterclaimant White Arnold & Dowd P.C. ("WAD") opposes the Motion for Summary Judgment ("Motion") filed by Defendants/Counterclaimants TomPaul ACIPCO, LLC, and Paul Smith (collectively "TomPaul"). (Doc. 54, Oct. 11, 2024, Mot. Summ. J.) The undisputed facts establish not only that WAD did not breach the standard of care of attorneys practicing in the state of Alabama, but also, to the extent there are disputes of material fact, those disputes prevent TomPaul from being entitled to judgment as a matter of law.

Further, WAD asserts TomPaul is not entitled to pre-judgment interest, as the amount they allege is owed is not a "sum certain," and TomPaul has not stated a claim under which attorneys' fees are recoverable.

In further support of its motion, WAD states:

4

I.    **STATEMENTS OF FACTS**

A.    WAD's Response to TomPaul's Statement of Undisputed Facts

1.    In June 2021, Defendants engaged WAD to perform legal services for them related to a dispute in Alabama (Underlying Litigation). As part of that engagement, WAD and Defendants entered into a legal representation agreement through an engagement letter (Engagement Letter). Exhibit 1 to the White Depo., Doc. 50-3 at 2. **WAD Response: Undisputed.**

2.    A few days before the date on the Engagement Letter, an attorney-client relationship formed between WAD and Defendants. Doc. 30 at ¶¶ 17–19; White Depo., Doc. 50-2 at 20:4–22. **WAD Response: Undisputed.**

3.    Within six business days, WAD billed Defendants $46,404.00. Exhibit 2 to the White Depo., Doc. 50-3 at 6 (June 2021 Invoice). **WAD Response: As worded, the statement is undisputed, but incomplete. Please see Additional Statement of Undisputed Facts, below, for further explanation.**

4.    Five partners billed time on the June 2021 invoice. *Id.* **WAD Response: As worded, the statement is undisputed, but incomplete. Please see Additional Statement of Undisputed Facts, below, for further explanation.**

5.    On July 30, 2021, WAD filed a claim in the Underlying Litigation against ARC Alabama, LLC; Dreher Investments, LLC; Jefferson Iron and Metal Brokerage, Inc.; Steel City Recycling, LLC; Paul Dreher; George Dreher; and

George "Jake" Dreher, Jr., No. 2021-cv-000154, in the Circuit Court of Jefferson County, Alabama. Exhibit 4 to the White Depo., Doc. 50-3 at 33. **WAD Response**: **WAD filed a complaint to initiate the Underlying Litigation. The complaint included the entities and individuals identified in this paragraph but also included American Cast Iron Pipe Company ("ACIPCO").**

6.     This claim never advanced to discovery. No. 2021-cv-000154, in the Circuit Court of Jefferson County, Alabama. *See* White Depo., Doc. 50-2 at 40:15–47:18 (explaining the procedure of the Underlying Litigation from filing a TRO, participating in mediation, and filing a contempt petition). **WAD Response**: **Disputed. (*See*, *e.g.*, Doc. 50-6, 5 (Subpoena for Elizabeth Dreher Lawrence); 6 (Subpoena for Jason Brown; Notice of Discovery e-filed, subpoena for Ronnie Browning), 7 (Subpoena for Regions Bank, Subpoena for Southpoint Bank), 8 (subpoena for KMAC Recycling & Industrial Services, subpoena for Liberty Recycling, Inc.), 9 (subpoena for Power Screen Sales and Rentals, subpoena for Process Knowledge Corporation); *see also* Doc. 72-1, 6-8 (M. White Declaration, November 13, 2024, at ¶ 13.) for the many additional discovery efforts WAD conducted.)**

7.     Six lawyers spent at least some amount of time working on the complaint that was filed in the Underlying Litigation. White Depo., Doc. 50-2 at 12:5–10; Exhibit 3 to the White Depo., Doc. 50-3 at 32; Dowd Depo., Doc. 50-11 at

12:6–10.  **WAD Response: As worded, the statement is undisputed, but incomplete. Please see Additional Statement of Undisputed Facts, below, for further explanation.**

8.    Over the course of the Underlying Litigation, WAD partners billed at least 97% of the hours and fees.  *See* Jardini Report, Doc. 50-12 at 77. **WAD Response: Disputed.  WAD has shareholders, not partners.  WAD does not dispute that shareholders billed the majority of the hours and fees charged because it did not have any associates at the time TomPaul retained it. (*See* Doc. 72-1, 3-5 (M. White Decl. at ¶ 9.))**

9.    WAD had multiple attorneys attend the mediation, meetings, client conferences, and site visits.  *See* Jardini Report, Doc. 50-12 at 80.  **WAD Response: Undisputed as such is a common practice in complex litigation.**

10.    The individual tasks that each attorney performed at the mediation, meetings, client conferences, and site visits is not described in the invoices sufficient to understand the different roles of each attendee.  *Id.*; *see also* White Depo., Doc. 50-2 at 28:20–30:9. **WAD Response: Disputed. This is Mr. Jardini's opinion, not a fact. For example, on June 24, 2021, only the second day WAD had any contact with TomPaul, Ms. Dowd entered time for "Conference call with Mark in preparation for call today, conference call with Steve, Mark re same; review documents received today from Paul Smith in preparation for conference call**

Case 2:23-cv-01372-ACA    Document 74    Filed 11/15/24    Page 8 of 34

today; attend and participate in conference call." (Doc. 50-7, 2.) That description clearly identifies who participated in calls; the purpose for reviewing the calls; the reasons for conferences among Wad counsel; and the attendance at a client conference. That same day, Mr. White billed for "Conference call with client and Sandy [Ain]; T/C BP, receipt additional documents, conflict check, review additional documents, status and strategy memo to WAD team." (Doc. 50-7, 3.) The entire context of the day's billing provided much of the information Mr. Jardini claims is missing. As these entries were consistent with the terms of the Retention Agreement and paid by TomPaul within six days of receipt of the invoice containing these entries, they were sufficient for TomPaul. (Doc. 72-1, 6 (M. White Decl. at ¶ 12.); Doc. 50-3, 2 (White Dep. at Ex. 1 (Retention Agreement)).)

11.    The attorneys on this file billed for conferencing. *See* Jardini Report, Doc. 50-12 at 81. **WAD Response: Undisputed. WAD attorneys billed for conferences with Mr. Smith and with each other to ensure information was being shared and strategies discussed, as is common in complex litigation.**

12.    Two partners in particular billed over 47% and 44% of their total hours conferencing. Two other partners billed over 28% and 20% respectively. *Id.* **WAD Response: Disputed. WAD has shareholders, not partners. (*See also* Doc. 72-1, 3-5 (M. White Decl. at ¶ 9.)) Further, the percentages cited by TomPaul are**

8

**based on Mr. Jardini's flawed methodology intended to be misleading. For example, the "47%" reference in this paragraph determined by Mr. Jardini is related to Steve Arnold's time billed to the TomPaul matter, which totaled 2.1 hours. Mr. Jardini takes an excerpt from Mr. Arnold's time entry - "tele conference with JMW & ASD re best approach and requirements of contempt pleadings" - arbitrarily assigns that excerpt a value of 1.0 hour, then divides that 1.0 hour by the total 2.1 hours and concludes that Mr. Arnold billed over 47% of his time on conferencing. (*See* Doc. 50-12, 81, 124 (Jardini Report at ¶59, Ex. 4 (Interoffice Communications Exhibit)).)**

13.    Some of the entries contain the tasks described as: "review additional notes," "reviewed and sent email re same matters," "work on numerous drafts of various pleadings," "research key issues," "research," "work on same," and "review case materials." *Id.* at 82. **WAD response: Disputed.  As noted above, Mr. Jardini criticized Mr. White's entry on June 24, 2021, as being vague, but he only includes the language "T/C BP, receipt additional documents, conflict check, review additional documents, status and strategy memo to WAD team."  He did not take into account Ms. Dowd's description of her work (see paragraph 10 above) or the first part of Mr. White's billing entry "Conferenced call with client and Sandy [Ain]."  Therefore, this fact is disputed as it takes the comments in the billing out of context and fails to include the full context of the**

billing statement. **This is just one example of several in Mr. Jardini's claim that WAD engaged in "vague" billing practices.**

14.     Attorneys billed for traveling to the clerk's office for numerous court filings, transcribing calls, taking notes, downloading documents, assembling materials for mediation, finalizing exhibit binders, and pulling documents.  *Id.* **WAD Response: Undisputed. Given the great client expectations and demands, and the complexities of the Underlying Litigation, there were instances in which WAD attorneys billed for these activities to ensure extremely important tasks, such as the physical filing of the complaint, were done correctly given the importance to the client, as such is a common practice in complex litigation. Such activities were billed by either attorneys with lower rates or by paralegals or legal assistants at the agreed-upon rate stated in the Retention Agreement. (*See* Doc. 72-1, 10 (M. White Decl. at ¶ 18.)**

15.     Attorneys engaged in block billing practices.  *Id.*  **WAD response: Undisputed, however TomPaul's use of the term "block billing" is intended to infer a nefarious purpose. "Block billing" is not *per* se improper. WAD, consistent with the Retention Agreement with TomPaul, provided TomPaul a non-exhaustive summary of the work performed by WAD and such billing method was acceptable to TomPaul at the time it retained WAD and re-approved by Paul Smith in his deposition. (*See* Doc. 72-1, 10 (M. White Decl. at**

**¶ 18.); Doc. 50-3, 2 (White Dep. at Ex. 1 (Retention Agreement)); Doc. 40-3, 43**

**(P. Smith Dep. 161:20 – 162:17.))**

16.    Because of WAD's practice of block billing, it is impossible to discern how much time was spent per task for the block billed entries that contain multiple tasks within them.  *See* White Depo., Doc. 50-2 at 27:25–28:19; 29:1–25.  **WAD Response: Undisputed.  However, per the Retention Agreement, WAD was not required to explain how much time was spent per task. (*See* Doc. 50-3, 2 (White Dep. at Ex. 1 (Retention Agreement)); Doc. 72-1, 10 (M. White Declaration at ¶ 18.)) See also Additional Undisputed Facts, below.**

17.    Defendants have already paid over $1.25 million to WAD for its work. Doc. 50-8 at 237–38.  **WAD Response: Undisputed.**

18.    The above-described practices caused WAD to bill Defendants for more money than they should have.  *See* Jardini Report, Doc. 50-12 at 73.  **WAD Response: Disputed.  (*See* Doc. 50-9, 69 (B. Rogers Report at ¶19.); Doc. 72-1, 10-11 (M. White Decl. at ¶ 18.)); See also Additional Undisputed Facts, below.**

19.    Had WAD not engaged in the above-described practices, they would have earned a total of $802,566.75 in fees.  *Id.*  **WAD Response: Disputed.  This is not a statement of fact; instead, it is Mr. Jardini's opinion based on his flawed methodology, which includes the arbitrary assignment of time to tasks with no knowledge or understanding of the activity taking place in the Underlying**

**Litigation and all of the communications with the client and many other necessitated by the client's demands and the actions of the opposing parties. Further, Mr. Jardini fails to take into account the terms of the Retention Agreement, the attorneys working for WAD when TomPaul retained it, or the standard of practice in the state of Alabama. (*See generally* Doc. 40-2, Jardini Expert Report.)**

B.    Additional Statement of Undisputed Facts in Opposition to TomPaul Motion for Summary Judgment.

1.    This matter arises out of TomPaul's failure to pay WAD $366,547.11 in attorneys' fees arising out of litigation between TomPaul, ARC Alabama, LLC, Dreher Investments, LLC, Jefferson Iron and Metal Brokerage, Inc., Steel City Recycling, LLC, Paul Dreher, George Dreher, George "Jake" Dreher, Jr., and American Cast Iron Pipe Company ("Underlying Action").  (Doc. 1-1, Compl. 2, ¶ 2, Sept. 8, 2023.)

**1.    The Retention Agreement.**

2.    As part of representing TomPaul in the Underlying Action, WAD and TomPaul entered into a Retention Agreement that incorporated WAD's Statement to Clients Regarding Firm Engagement Policies (collectively "Retention Agreement").  (Doc. 50-1, 21 (Smith Dep., 75:14-23); Doc. 50-7, 24 (Ex. 8 to

Burrow and Smith Deps. Jun. 25, 2021, (Retention Agreement)).)  The Retention

Agreement defined the terms of WAD's engagement by TomPaul.  (*Id.*)

3.    Paul Smith signed the Retention Agreement "individually and on behalf

of TomPaul ACIPCO."  (*Id.* at 25.)

4.    According to the Retention Agreement, "Your representation will be

handled by August Dowd, Kitty Brown, W. Chambers Waller, and [Mark White]"

and "[w]hen appropriate or necessary, work will be performed by other lawyers in

the firm."  (*Id.* at 24.)

5.    The Retention Agreement further states, "[w]e will send to you a

monthly statement for services and other charges, which will include **a non-**

**exhaustive summary of the work performed**, the number of hours worked by each

lawyer and/or paralegal, that person's billing rate, and the total number of hours

spent on your representation during that month." (*Id.*) (emphasis added.)

6.    The Retention Agreement also provides that "the amount we charge for

our legal and paralegal services is calculated by multiplying the number of hours

worked by each lawyer and paralegal by that person's then current applicable hourly

rate for the type of work to be performed."  (*Id.*)

7.    The Retention Agreement also did not mention, much less prohibit,

block billing – one of TomPaul's major complaints. (Doc. 50-7, 24)

8.    Additionally, "Client acknowledges and agrees that it shall be fully responsible for any expenses, including without limitation attorneys' fees, incurred by WAD to collect overdue statements for services rendered with other charges of the firm." (*Id.*)

9.    Throughout the underlying litigation, Mark White was the primary contact for all handlings related to Paul Smith. (Doc. 50-2, 16 (White Dep. 53:8-10).)

## 2.    The Activity in the Underlying Action.

10.    TomPaul's counterclaim does not describe the activity WAD took in the Underlying Action.  However, Bruce Rogers, in his Report and deposition, did. (*See* Doc. 50-6 Ala. SJIS Case Detail of Underlying Action.)

11.    At the initial consultation between Mr. White, Ms. Dowd, Mr. Smith, and Mr. Ain, Mr. Smith expressed concerns about a number of issues that would need to be addressed in any litigation:

- The violation of the Plant Modification Agreement ("PMA") by TomPaul's joint venture partner ARC Alabama, LLC ("ARC"), because ARC refused to comply with the dispute resolution provisions of the PMA;

- ARC's removal of product created using TomPaul's technology from the American Case Iron Pipe Company ("ACIPCO") Landfill No. 2 and ARC's sale of such product without proper payment to TomPaul;

- The millions of dollars Smith already had spent on the joint venture and the amount he continued to pay vendors without any return on his investment;

- ARC bringing third-party material onto the landfill and either piling it up to an environmentally dangerous level or processing it with TomPaul's equipment, thus creating potential environmental liability and reputational risk for TomPaul, Smith, other enterprises owned by Smith, and ACIPCO;

- ARC's refusal to provide TomPaul written confirmation that the environmental indemnity ACIPCO agreed to provide ARC through a Service Agreement between ACIPCO and ARC was extended to TomPaul, despite the fact that ARC had represented to TomPaul that ACIPCO environmental indemnity extended to TomPaul;

- Concern that ACIPCO was not aware of ARC's actions related to the operations increasing the potential environmental liability;

- ARC allowing at least one unaccompanied visitor onto the landfill and thus allowing that visitor to see TomPaul's proprietary technology;

- ARC's denial of access to cameras placed at the landfill through which TomPaul could monitor operations;

- ARC's refusal to provide financial information to TomPaul;

- ARC's harassment of TomPaul's onsite employee;

- Smith's desire to be fully extricated from the business arrangement with ARC;

- Smith's desire to be fully compensated by ARC; and

- Smith's desire to have responsive counsel "24/7."

(Doc. 72-1, 2-3 (White Decl. ¶ 8.))

12.     The Complaint in the Underlying Action was filed July 30, 2021.  (*See* Doc. 50-6, 2.)

13.     In those first eight days of WAD's retention of TomPaul, WAD, through its attorneys, engaged in at least the following activities:

- Reviewing the PMA, the Amendment to the PMA, the Service Agreement between ACIPCO and ARC, various letters between TomPaul and ARC; emails between TomPaul or its then-counsel John Camozzi and ARC; and documents related to the unexpected shipments of product by ARC;

- Researching Delaware law as the chosen state for purposes of the PMA;

- Researching the impact of TomPaul, a Delaware limited liability company, not being registered to do business in Alabama;

- Arranging the registration of TomPaul to do business in Alabama to permit it to pursue its claims;

- Numerous discussions with multiple individuals Smith recommended WAD talk to, including Jimmy Burrow, Bob Brewer, Bill Perry, and Adam Floyd to gather details about ARC's financial and operational antics at the landfill;

- Preparing document preservation letters to multiple entities controlled by ARC's owners;

- Preparation of a letter to ARC invoking the dispute resolution provisions of the PMA; and

- Several discussions and written communications between Augusta Dowd and ARC's then-counsel, Walter Scott, regarding the dispute.

(Doc. 72-1, 5-6 (White Decl. ¶ 11.))

15.     WAD's attorneys worked extensively on addressing Mr. Smith's varied and complex concerns.  (Doc. 72-1, 10 (White Decl. at ¶18.))

16.     However, Ms. Dowd and Mr. White, the two attorneys primarily responsible for the Underlying Litigation, attended the mediation sessions and were the only WAD attorneys to attend any mediation session. (*Id.*)

### 3.     WAD's Efforts to Keep TomPaul Informed.

17.     Throughout the Underlying Action, WAD engaged and discussed the strategy with TomPaul and kept TomPaul informed throughout. (*See* Doc. 50-7, Combined Exs. From Burrow Dep. and Smith Dep., 12 (Ex. 4 – Email from L. Flippo confirming registration of TomPaul to permit litigation); 14 (Ex. 5), 18-20 (Ex. 6), 21 (Ex. 7), 28-29 (Ex. 9), 30-41 (Ex. 10 – providing proposed narrative for use in mediation), 42-43 (Ex. 11), 44 (Ex. 12), 45 (Ex. 13), 46-47 (Ex. 14), 109-111 (Ex. 19), 127 (Ex. 20), 128 (Ex. 21), 129 (22), 131-132 (Ex. 23 at pp. 2-3), 133 (Ex. 24), 135 (Ex. 26), 137 (Ex. 28), 139-147 (Ex. 29 – Memorandum with anticipated budget for three different litigation paths); Doc. 50-1 199 (Smith Dep. Ex. 32 – confirming Paul Smith instruction to stop working and providing additional information on status and likely next activity).) These are just some of the many, many email communications to Mr. Smith and Sandy Ain. (*See* Doc. 72-1, 9 (White Decl. at ¶15.))

18.     Those memoranda provided additional information and details regarding the activities each month.

19.     However, Mr. Burrow, the CFO of TomPaul, testified to having only read memoranda attached to emails if it appeared he needed to know what was going on. (Doc. 50-8, 34 (Burrow Dep. at 127:1-4).)

20.     Meanwhile, Mr. Smith testified that he did not review WAD's invoices, either. (Doc. 50-1, 12 (P. Smith Dep. at 39:22 – 40:2.)

21.     Despite alleging in his counterclaim that WAD engaged in improper block billing, when Mr. Smith actually read an entry from one of WAD's invoices, he had no issue with the how the work was described and charged. (*Id.* at 43 (162:1-17).)

22.     Mr. Smith never complained to WAD that he did not understand the billing entries or that he felt the descriptions were too vague for him to understand what work was being done. (*Id.* at 131: 9-24.) He never complained that the work billed by WAD was not being done. (*Id.* at 131: 9-12.) He never raised any concern with WAD that the work conducted in the Underlying Action was inconsistent with the time entries on the invoices. (*Id.* at 131: 13-16.)

23.     Mr. White took phone calls from Mr. Smith at all hours, on weekends, and on holidays. Even Mr. Smith admitted that he called Mr. White multiple times a day, even on weekends and holidays. (Doc. 50-1, 29-30 (Smith Dep. at 108:25 –

109:11).) During WAD's representation of TomPaul, Mark White alone had 1,180 cell phone calls with Mr. Smith and individuals Mr. Smith recommended Mr. White talk to including Sandy Ain, Jimmy Burrow, Bob Brewer, Adam Floyd, Erika Harris, and Bill Perry. (*See* Doc. 72-1, 8-9 (White Decl. at ¶14.)) This does not include the numerous calls Mr. White had with Smith from his home telephone. (*Id.*)  Separately billing each conversation would have been unreasonable.

24.    Mr. Smith also requested additional representation or make additional demands for WAD's time – related both to the Underlying Action and to other matters that he asked WAD to handle. (Doc. 50-2, 14 (White Dep. at 48: 14-19); *see also* Doc. 50-7, 44 (describing work to set aside default judgment in matter involving Kirkpatrick Concrete).)

25.    The pleadings in the Underlying Action also demonstrate the complexity of the issues involved.

26.    WAD had to develop the facts necessary to file a comprehensive complaint. (Doc. 50-9, 63 (Rogers Dep. at Ex. 5 (Expert Witness Report), ¶ 8).)

27.    WAD then had to prepare and file a petition for a temporary restraining order, which was granted. (*Id.*)

28.    WAD pursued extensive discovery and issued subpoenas to support the claims in the Underlying Action.  (*See* Doc. 50-6 Ala. SJIS Case Detail of Underlying Action; Doc.72-1, 6-8 (White Decl. at ¶ 13.))

29.    WAD then discovered information, through its efforts, that indicated the defendants in the Underlying Action had committed additional acts which led to the discussion of, and drafting of, an amended complaint to state a Civil RICO claim. (Doc. 50-9, 66 (Rogers Dep. at Ex. 5 (Expert Witness Report, ¶13.))

### 4.    Mr. Jardini's Lack of Methodology and Impartial Review.

30.    Although TomPaul relies on Mr. Jardini entirely to support its motion for summary judgment, it ignores the flawed nature of Mr. Jardini's methodology.

31.    Mr. Jardini randomly cuts time and billing amounts from WAD's invoices, without explaining how he determined what arbitrary value to assign to an excerpt of a time entry in order to calculate such cuts.  (*See* Doc. 40-4, 2022-03-14 Invoice at 6.)

32.    Mr. Jardini had not read, and has not considered, the Retention Agreement to determine the extent to which that Retention Agreement set out TomPaul's and WAD's agreement sets out the standard of care.  (Doc. 40-1, 11 (Jardini Dep. at 37:10-15).)

33.    Although Mr. Jardini states certain types of billing are "problematic," he has provided no support for his statements that in this situation, WAD's billing practice, which was embraced by Mr. Smith, was intended to "churn" the file and breach WAD's standard of care.  (Doc. 40-1, 18 - 19 (Jardini Dep. ¶ 74-75.))

34.    Mr. Jardini did not review the provisions of the ALSLA or any other aspect of Alabama law before reviewing the invoices and applying his random percentage cuts.  (Doc. 40-1, 18 (Jardini Dep. ¶ 17-23,))

## II.    <u>STANDARD FOR SUMMARY JUDGMENT.</u>

This Court is aware of the standard for summary judgment, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (quoted in *Harris v. Shahla*, No. CV-13-S-1617-NE, 2014 WL 3689791, *1 (N.D. Ala. Jul. 22, 2014)).  When deciding whether summary judgment is proper, the court must review all of the evidence submitted and "make all reasonable inferences in favor of the party opposing summary judgment[,]" as to *this* motion, WAD.  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Importantly, though, a party need not prove a negative.  Rather, the movant, in this case Paul, seeks summary judgment affirmatively, asking the Court to find that WAD breached the standard of care and owes TomPaul a refund.  (Doc. 54 TomPaul Mot. Summ. J. p. 17.)

In the present case, TomPaul cannot establish that WAD violated the standard of care, as claimed both in its Counterclaim and its Motion.  The purported "breaches" do not, in fact, constitute a violation of the standard of care in the state

of Alabama and, more importantly, TomPaul does not have evidence that they do. Additionally, the claim that WAD somehow owes TomPaul money is not supported by either TomPaul's motion for summary judgment or the evidence in this matter. Accordingly, WAD moves this Court for judgment in its favor on TomPaul's one count against it.

## III.   THE ALLEGED BREACHES OF THE STANDARD OF CARE IN ALABAMA ARE NOT SUPPORTED BY TOMPAUL'S STATEMENT OF FACTS.

The ALSLA, in relevant part, requires:

> In any action for injury or damages or wrongful death, whether in contract or in tort, against a legal service provider, the plaintiff shall have the burden of proving that the legal service provider breached the applicable standard of care. The applicable standard of care shall be as follows:
>
> > (1) The applicable standard of care against the defendant legal service provider shall be such reasonable care and skill and diligence as other similarly situated legal service providers in the same general line of practice in the same general area ordinarily have and exercise in a like case.

Ala. Code § 6-5-580(1) (1975, as amended).

Although WAD is not required to prove a negative (that it did *not* breach the standard of care), the undisputed facts establish WAD did not, in fact, breach the standard of care owed by attorneys in the state of Alabama, engaged in complex litigation, with millions of dollars at stake.

22

As noted above, TomPaul's specific complaints about WAD's billing practices that it claims violated the standard of care are:

a. Using inappropriate block billing of their time entries;

b. Having multiple firm personnel attend almost every notable event in the case, including meetings and mediation;

c. Performing unnecessary work;

d. Having more senior lawyers perform work that could be performed by more junior lawyers;

e. Engaging in excessive conferencing between WAD lawyers and staff about the case; and

f. Charging for administrative work, like preparing binders or transcribing calls.

(Doc. 19, at 5-6, ¶ 10.)

TomPaul admits that the parties' Retention Agreement also sets forth a standard of care. (Doc. 54, 7 ("The Standard of care in this case derives from three sources. The first source is the parties' [Retention Agreement].").) That Retention Agreement, and the accompanying Firm Engagement Policies, defines the relationship between TomPaul and WAD. All of the criticisms raised by TomPaul, even if they should be considered, are invalid and do not establish a breach of the standard of care. At best, it creates a question of material fact.

A.   <u>Block Billing Is Not a Violation of the Standard of Care in Alabama.</u>

One of TomPaul's primary claims of a breach of standard of care is the use by WAD of block billing.  However, counsel for TomPaul has not identified any case law declaring the use of block billing to be a breach of the standard of care. Accordingly, its claim for summary judgment against WAD on that basis fails.

TomPaul relies heavily on American Bar Association Formal Opinion 93-379 for the standard of care.  (Doc. 54, 9-10.)  However, Formal Opinion 93-379 does not address block billing, does not state whether multiple attorneys attending a hearing or mediation is a breach of the standard of care, and does not speak to any of TomPaul's belatedly raised complaints.

"Absent a contrary understanding, any invoice for professional services should fairly reflect the basis on which the client's charges have been determined." (Doc. 50-10, Ex. 7 to Rogers' Dep. (Formal Opinion 93-379.)) "[T]he lawyer may recoup expenses reasonably incurred in connection with the client's matter for services performed in house, such as photocopying, long distance telephone calls, ... special deliveries, and other similar services, so long as the charge reasonably reflects the lawyer's actual cost for the services rendered." (*Id.*) The Formal Opinion also notes that the disclosure of the bases for an amount charged is two-fold: setting the hourly rates "but also a sufficient explanation in the statement so that the client may reasonably be expected to understand what fees and other charges the client is

actually being billed." (*Id.* at 2.) "A corollary of the obligation to disclose the basis for future billing is a duty to render statements to the client that adequately apprise the client as to how that basis for billing has been applied." (*Id.*) While the Formal Opinion criticizes a statement "setting out no more than a total dollar figure for unidentified professional services[,]" it does not require that each individual activity be broken out and separately billed.

Further, as noted in *Jarvis v. TaylorChandler, LLC*, in which the court evaluated a claim for attorneys' fees under a prevailing party provision, "Plaintiff's block billing is unproblematic in the state of Alabama as long as Plaintiff has provided enough detail for a court to assess the fees." *Jarvis v. TaylorChandler, LLC*, 2:17-cv-00396-ALB 2021 WL 67204, * 6 (M.D. Ala. Jan. 7, 2021).

In the present case, the issue is not whether a *court* should award the fees demonstrated in the various invoices submitted to TomPaul – Jimmy Burrow, Sandy Ain, *and* Paul Smith. Rather, the issue is whether block billing violates the standard of care. Formal Opinion 93-379 does not establish that block billing is a violation of the standard of care unless it was purposefully engaged in to intentionally increase fees and TomPaul has put forth absolutely no proof that occurred. The Retention Agreement does not prohibit block billing. Paul Smith had no problems or concerns about the use of block billing. Instead, without reviewing the position in Alabama regarding block billing, TomPaul's purported expert asserts without support that

block billing is improper.  That is insufficient evidence to establish a breach of the standard of care and, as such, does not support TomPaul's motion for summary judgment.

B.  <u>TomPaul fails to provide evidence that WAD improperly staffed the Underlying Litigation, particularly in light of the extent of work needed.</u>

Although TomPaul relies on Mr. Jardini's complaints that multiple attorneys attended meetings, engaged in unnecessary work, and that less senior lawyers should have performed the work, Mr. Jardini clearly ignored that, as evidenced in the invoices, many of the lower-rate attorneys did an extensive amount of the work and the two lead attorneys with higher rates were focused on meeting the constant demands of the client, dealing with the revolving door of opposing counsel, and focusing on the mediation process while keeping the litigation track moving forward for maximum effect.

Taking the claim that WAD had shareholders performing the work associates should, Jardini admitted in his testimony that he never considered the types of attorneys WAD had when it was working on the Underlying Litigation.  (Doc. 40-1, 18 (Jardini Dep. ¶ 54.))

As explained by Mark White, WAD had twelve shareholders and no associates.  (Doc. 72-1, 3 (White Decl. at ¶ 9).)  Therefore, it was impossible for a lower-cost "associate" to perform 35% of the work, or 15% of the paralegal or law

clerk time – an opinion with no methodology provided or explained. Having shareholders perform the work on the complex, multi-pronged litigation in the Underlying Litigation does not violate either Formal Opinion 93-739 or Rule 1.5 of the Alabama Rules of Professional Conduct.

In light of Mr. Jardini's failure to consider the composition of WAD when it was retained in the Underlying Litigation, and the undisputed facts regarding that composition, TomPaul cannot establish it is entitled to summary judgment.

C.    TomPaul Has Not Provided Evidence That WAD Breached a Standard of Care by Having Multiple Attorneys Attend Meetings and Major Events.

TomPaul further alleges that it is entitled to judgment as a matter of law because, according to Jardini, WAD had multiple attorneys attend meetings and "major events" of the litigation. As this Court is aware, it is not uncommon for multiple attorneys to work on complex matters. TomPaul itself now has three attorneys working in this matter and two of those attorneys attended the depositions of Mark White, Augusta Dowd, and Bruce Rogers.

TomPaul admits the standard of care is derived from three sources: the Retention Agreement, Formal Opinion 93-379, and Rule 1.5 of the Alabama Rules of Professional Conduction. None of those sources prohibit multiple attorneys from attending significant events in litigation, such as mediation. Moreover, none of them prohibit or limit the number of attorneys who attend "major' litigation events."

Even so, it is undisputed that only Ms. Dowd and Mr. White, the two attorneys primarily responsible for the litigation, attended mediation sessions. (Doc. 72-1, 10 (White Decl. at ¶18).) TomPaul cannot point to *any* legal authority that states that having the two lawyers primarily involved in litigation attend those events is a breach of the standard of care. Mr. Jardini, who is unfamiliar with the practice of law in the state of Alabama, and who read only a limited number of pleadings but did not talk to anyone actually working in the Underlying Litigation, did not read any of the hundreds of email exchanges between WAD and TomPaul or WAD and counsel in the mediation or the mediator, and did not review the Retention Agreement, does not constitute such authority. Without that authority, TomPaul's motion for summary judgment fails.

Additionally, the Retention Agreement does not prohibit multiple attorneys attending hearings or mediation sessions, yet only Ms. Dowd and Mr. White attended the mediation sessions in this matter. (Doc. 72-1, 10 (White Decl. at ¶18).) Moreover, although Jardini criticizes having multiple attorneys attending important hearings and mediation sessions, he provides not support for his position that doing so constitutes a breach of the standard of care. He also does not provide an analysis from the state of Alabama providing his support for his blanket opinions and arbitrary calculations reducing WAD's invoices.

D.    <u>TomPaul Has Not Provided Undisputed Facts to Support its Claim that WAD's billing descriptions were vague.</u>

Additionally, the undisputed facts do not establish that WAD's billing entries were so vague that they should be discounted in any way. By pulling out mere excerpts and ignoring surrounding entries, TomPaul hides the context of the entry about which they complain and the work being provided by WAD.

For example, on June 24, 2021, Ms. Dowd entered time for "Conference call with Mark in preparation for call today, conference call with Steve, Mark re same; review documents received today from Paul Smith in preparation for conference call today; attend and participate in conference call." (Doc. 50-7, 2.) That description clearly identifies who participated in calls; the purpose for reviewing the calls; the reasons for conferences among Wad counsel; and the attendance at a client conference. That same day, Mr. White billed for "Conference call with client and Sandy [Ain]; T/C BP, receipt additional documents, conflict check, review additional documents, status and strategy memo to WAD team." (Doc. 50-7, 3.) The entire context of the day's billing provided much of the information Mr. Jardini claims is missing.

Additionally, even the client, Mr. Smith, did not complain that he did not understand the billing entries or that he felt the descriptions were too vague for him to understand what work was being done. (*Id*. at 131: 9-24.)

29

Therefore, the undisputed facts do not support Mr. Jardini's claim that the billing entries were so vague as to constitute a breach of the standard of care.

E.   TomPaul Has Not Provided Undisputed Facts to Support Its Claim that WAD Performed Unnecessary Work.

TomPaul does not even attempt to support its claim that WAD performed unnecessary work in its motion for summary judgment. (Doc. 54, 14-15.) At best, it argues that the development of factual basis for, and amending the complaint to state a claim, for civil RICO is something Mr. Jardini would not have done. (*Id*.) Even if Mr. Jardini has experience in RICO matters, he has absolutely no knowledge of the facts and circumstances of the Underlying Litigation beyond reading the Second Amended Complaint that was filed, and therefore it is improper for him to opine that a RICO claim should not have been filed in the Underlying Litigation. Paul Smith's own counsel, Sandy Ain, was the first to suggest a potential RICO claim during a June 25, 2021 conference call between WAD, Mr. Smith, and Mr. Ain, when Mr. Ain told WAD that when WAD talked to ARC's counsel, WAD should say that the consequence for not dealing with Smith to resolve the underlying dispute would be a lawsuit for fraud and civil RICO. (Doc. 72-1, 10 (M. White Decl. at ¶ 18(b)).)

TomPaul's argument does not establish that it is entitled to summary judgment as a matter of law for this alleged breach, either.

F.    <u>TomPaul Is Not Entitled to Attorneys' Fees or Pre-Judgment Interest.</u>

In its Motion, TomPaul asks this Court to award, among other damages, attorneys' fees and pre-judgment interest.  TomPaul is not entitled to either.

Federal courts in diversity cases follow state law in matters of substance, and the measure of damages is thought to have a large substantive element in it. Therefore, state law has been held to govern the measure of damages in diversity cases. *Transcon. & W. Air v. Koppal,* 345 U.S. 653 (1953).  Attorneys' fees are not awarded to the prevailing party under Alabama law absent some statutory right to fees or an express contractual provision specifically authorizing award of attorneys' fees under the particular circumstances presented.    *Id*. Neither of those circumstances exist here.

The Retention Agreement between WAD and TomPaul in the Underlying Litigation provides an express contractual provision that TomPaul will pay WAD's attorneys' fees if WAD has to sue to recover its fees.  It is *not* a prevailing party provision.  Therefore, TomPaul has no basis to seek to recover its fees in this matter.

In federal diversity cases, the availability and amount of prejudgment interest is ordinarily governed by state law. *See Venn v. St. Paul Fire & Marine Ins. Co.,* 99 F.3d 1058, 1066–67 (11th Cir.1996). Alabama law authorizes prejudgment interest only in those contract cases where the damages are certain or capable of being made

certain. *Miller & Co. v. McCown,* 531 So.2d 888, 889 (Ala.1988); Ala. Code § 8-8-8 (1975).

In this case, the damages alleged in the Counterclaim are not "damages … certain or capable of being made certain...at a given time so as to be capable of a determination at such time in accordance with known standards of value" *Foster,* 304 So. 3d at 218. Thus, TomPaul is not entitled to an award of prejudgment interest.

## IV.    <u>CONCLUSION.</u>

TomPaul's motion for summary judgment is due to be denied.  TomPaul has not established that WAD breached the standard of care in any of the various ways alleged.  TomPaul attempts to support their claims with an expert who has no experience in Alabama law or litigation, and whose methodology to determine an amount TomPaul claims it is owed is arbitrary.  Nevertheless, even considering TomPaul's expert's opinions, those opinions are contradicted by the three sources for the standard of care identified by TomPaul.

Accordingly, and for all of the reasons stated above, the motion for summary judgment filed by TomPaul ACIPCO, LLC, and Paul Smith is due to be denied.

Respectfully Submitted,

*/s/ Stacy L. Moon*
Stacy L. Moon (ASB-6468-I72S)
L. Weathers Veazey Rollings (ASB- 0528-A15O)
*Attorneys for Plaintiff-Counterclaim Defendant*
*White Arnold & Dowd, P.C.*

OF COUNSEL:
**GORDON REES SCULLY**
**MANSUKHANI, LLP**
505 20th Street North – Suite 1650
Birmingham, AL 35203
P: (205) 980-8200
smoon@grsm.com
wrollings@grsm.com

Charles R. Johanson, III
Alto Lee Teague, IV
*Attorneys for Plaintiff/Counterclaim Defendant*
*Plaintiff White, Arnold & Dowd, P.C.*

OF COUNSEL:
**ENGEL, HAIRSTON &**
**JOHANSON, P.C.**
P.O. Box 11405
Birmingham, AL 35202
P: (205) 328-4600
rjohanson@ehjlaw.com
lteague@ehrblaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 15th day of November, 2024, the foregoing has been service upon the following counsel of record via the CM/ECF:

William G. Somerville
Jade E. Sipes
Lindsay P. Lounsbury
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**
1901 Sixth Avenue North, Suite 2600
Birmingham, Alabama 35203
P: (205) 328-0480
wsomerville@bakerdonelson.com
jsipes@bakerdonelson.com
llounsbury@bakerdonelson.com

/s/ *Stacy L. Moon*
OF COUNSEL